Our second case for this morning is Marshall v. Indiana Department of Correction and we should have Ms. Blevins and Mr. Moravich on the phone. Yes, Your Honor. Yes, Judge. Excellent. So, Ms. Blevins, you may proceed. Thank you. May it please the Court, my name is Sandra Blevins of Dutton Blevins in Indianapolis, Indiana, and I represent Robby Marshall, the plaintiff appellant in this case. Mr. Marshall was fired from his 22-year career at the Indiana Department of Correction because of his sexual orientation after his subordinate, Mr. Bob Storm, accused Mr. Marshall of sexual harassment. Mr. Storm complained of this alleged harassment 18 months after it allegedly occurred and significantly one day after Mr. Marshall confronted Mr. Storm about a serious breach by Mr. Storm of internal affairs strict confidentiality policy for which Mr. Marshall was recommending discipline against Mr. Storm. So Ms. Blevins, let me ask you what seems to me to be the central question. I mean, you're right about the timing of all of this. I'm not sure whether I think 18 months is a long time or a short time or an average time given what one reads about. But the important thing seems to be that when this allegation is made, the department investigates it. They appoint some outside people to come in and in the end, what evidence is there that they didn't genuinely believe that Mr. Marshall had a problem with alcohol, that he wasn't behaving in the way that they expect somebody who's a department employee to behave? You know, in short, what tells us that their reasons for letting him go were not genuine reasons, having nothing to do with his sexual orientation? Right. Well, as we believe that the investigation was so flawed as to be evidence of discrimination. So there were no eyewitnesses to this harassment except Mr. Storm and allegedly Mr. Marshall. But the investigation into Mr. Marshall's sex was flawed. It was based solely on the fact that both Warden Brown and Mr. Marshall identified as  Mr. Richard Brown was excluded from the investigation. Well, excuse me, but why do you say that? They interviewed a number of people. You think they should have interviewed more people. I understand that. Yes, correct. They interviewed people. They had some information from this Indianapolis conference issue. If it were the case, I'm not saying it is, but if it were the case that Mr. Marshall becomes disinhibited under the influence of alcohol, he would be not the only person. And certainly that has nothing to do with sexual orientation. It's a different problem altogether. Maybe it's an ADA problem. I don't know. But it's... But the allegations, I understand that the allegations of the sexual harassment, though, Mr. Marshall was not alleged to have been under the influence of alcohol. In fact, Mr. Storm said that he was not and that these allegations were made when he was not under the influence of alcohol. So I don't believe that that issue factors into this because both the warden and Mr. Radersdorf, who investigated the law enforcement conference issue, both indicated that he would not have been fired for that sole issue. And so it was the allegations into the sexual harassment that were significant. And my point about... Warden Brown was interviewed, but he was excluded from the decision-making process by design because state personnel investigators believed he and Mr. Marshall had an intimate relationship because both of them identified as homosexual. What if it was just, though... I mean, I think they said that they knew that Warden Brown had been friends with Mr. Marshall for 30 years or for a long time. And I could imagine, you know, an organization such as the Department of Corrections saying, you know, we don't want somebody's best friend... Never mind, you know, assume no sexual dimension to it, but we don't want somebody's best friend sitting there in judgment. We need to kick it up to the next level. Universities do that all the time. Sure, but yet in their interviews, Your Honor, they asked each of them if they had an intimate sexual relationship with each other. So it shows that they believed that that was the reason why Warden Brown couldn't be unbiased. But Warden Brown pointed out that he had previously disciplined Mr. Marshall three or four years earlier when he had a DUI. So he was able to be impartial, but they perceived that he could not be impartial because of his homosexuality and because of this issue. I mean, if there had been a female warden and a female making the accusations against Mr. Marshall, the female would not have been excluded simply because she was female, even if she were a friend. Let me quickly say, first of all, I don't know that. But now I'm going to come in from left field and ask you whether you think there's any reason we should defer deciding this case until the Supreme Court hands down its Zarda decision. Well, that very well may be possible. Obviously, the existing case law in this circuit is the unblocked decision by this court in Heidley v. Ivy Tech. But it is my understanding that in October of 2019, the U.S. Supreme Court did have an oral argument as to whether sexual orientation constitutes sex discrimination. And presumably that decision will be made sometime next month. I don't know with the pandemic if that's necessarily true, but that's what would typically happen. So it's possible that that would be an important and appropriate thing to do for the court to confirm that at least the U.S. Supreme Court agrees that this is a claim. At the time, though, I will tell you in this case, the other side has not challenged whether that was a claim. And neither did the district court decision challenge that it is an existing claim at this point in time. And so the case has moved forward because there was never an objection that sexual orientation was not a claim under Title VII. Okay. So, again, the investigation was also flawed because, as I indicated, all male employees were interviewed and no female employees were interviewed, even though the interviewees told the investigators that these individuals had relevant information. And Mr. Storm had actually spoken to one of the females about his allegations against Mr. Marshall after he reported them. Could I ask you, before you run out of time, you said you wanted to ask for rebuttal. I'm having trouble understanding your retaliation claim, given the sequence of events here and what you think he's being retaliated. What behavior is causing this retaliation? Well, Your Honor, in this case, we are alleging anticipatory retaliation, which this court has acknowledged is a claim and cited a Tenth Circuit case that says that action taken against, and this is Sowers v. Salt Lake County, 173-1122, action taken against an individual in anticipation of that person engaging in protected opposition to discrimination is no less retaliatory than action taken after the fact. So, in this case, we learned, after we filed our response to the motion for summary judgment in a hearing before the State Employee Appeals Commission, one of the persons finally admitted that at the meeting where they discussed the termination of Mr. Marshall's employment, they discussed him bringing a claim of discrimination for sexual orientation, and this was actually at a time when highly had not yet been decided. So, these individuals were talking about him bringing a claim at the same time they were talking about the termination of his employment. They say that they had already decided to terminate his employment as of the time of the meeting you're referring to. Is the record clear about that? The record is clear, actually, that they had not made that decision, and the record is clear that at the time they had that meeting, that is the same time that they discussed him bringing a claim. I believe that that's very clear in the record that that's what happened. And that's clear from what we filed. We then filed a SOAR reply and supplemental designation of that testimony, which the district court allowed into the record. And so it's clear that at that meeting, that is when they discussed that, and there's at least issues of material fact as to what order they discussed him in, since before that all the other persons had lied that they had even discussed it during that meeting. And, in fact, Mr. Radersdorf had previously testified that they had not discussed it, but at this hearing he came forth and said that they had discussed it at the same meeting. So I think the record is quite clear, based on Mr. Radersdorf's testimony, that they discussed Mr. Marshall bringing a claim for sexual orientation at the same time that they discussed his termination. And for that reason alone, we believe that this matter should be reversed, and the district court simply got it wrong when he said that at the time of the meeting, Mr. Marshall hadn't engaged in protective activity to which the adverse action could run. As a matter of fact, that's the whole point of anticipatory retaliation, is that the party hasn't yet engaged in protective activity, but it's anticipated that they will do so, and so the adverse action is made in connection with that anticipation that they will file that claim. So we believe that the district court got that wrong, clearly, when it made its decision about the anticipatory retaliation, and we believe that that claim alone should be reversed because the court's reasoning was inaccurate and incorrect on that point. All right. You're down to... Oh, sorry. Go ahead. I was going to say, wasn't that just an acknowledgment that that would be a different reason than why they just made that decision? Whatever you're talking about anticipatory. They said, well, that could have happened, but that isn't what we did here. That's basically who knew what they're saying. Well, what actually happened here, though, is that they did discuss it at the same meeting. If I'm understanding your question right, Your Honor, I'm sorry, Your Honor. Go ahead. Okay. It's my understanding that what the district court was saying, that you had to have protective activity before they made the adverse decision to have a claim, but that's not what anticipatory retaliation is. They anticipate they're going to make a claim, and they make an adverse decision, and that's what we believe happened here because they discussed them both in the same meeting, and that is very clear from the record that we supplemented on summary judgment. And what I was going to say is you're down to a little more than three minutes if you want to save some time, unless one of the other judges... I would love to save some time. Thank you, Your Honor. All right. So, Mr. Moravich, it's your turn. Good morning, judges. My name is John Moravich, and I represent the Indiana Department of Correction. Briefly, thank you for continuing your oral argument schedule during the pandemic. The Department of Correction did not terminate Mr. Marshall's employment because of his sexual orientation, nor was his sexual orientation a motivating factor in that termination decision. In fact, the Department of Correction terminated his employment because of two reasons. His unprofessional conduct towards Miami County Sheriff Tim Miller and several of his deputies at a statewide law enforcement conference on September 7, 2016, and a couple weeks later because of the sexual harassment report made by Robert Storm against Marshall. Storm was one of Marshall's subordinates, by the way. And there's just simply no evidence to infer that the Department of Correction terminated him for any other reason, nor that it did not honestly believe those stated reasons for his termination. Is there any evidence in this record, though? It's fishy that the day after Mr. Marshall uncovers the fact that Mr. Storm is inappropriately sending these reports over to his wife for editing and he's caught in the act, basically, and Mr. Marshall has gone through the proper channels to have access to those e-mails and the other evidence. So Mr. Storm is facing some very negative job consequences, which, in fact, ensue. He's moved away from this position. So somebody could lash out at a person and create a bogus charge of sexual harassment in retaliation for the very negative thing, as Mr. Storm would see it, that Mr. Marshall did to him. Yes, Judge. I agree with you in that point, but I'd like to expand upon that in that Mr. Storm explained to the investigators and in his statement why he waited until Marshall made those allegations against him. He explained that he did not come forward sooner about the sexual harassment allegations because he was afraid for his job. And once he was getting in trouble by Marshall's investigation, he felt free to come forward and make those allegations. And then my second point in that respect is that really goes to the credibility. Could we stay on the first point for a minute? It seems to me that there are factual issues there, though. There's a lot of evidence in this record that shows that both Mr. and Mrs. Storm had a pleasant social relationship with Mr. Marshall and his partner, and that all sorts of uncoerced activity went on. You don't have to go out and go to events with your coworkers if you don't want to. And so it seems pretty convenient for him suddenly to say, oh, I've been afraid for 18 months, but now that Mr. Marshall has found that I'm improperly revealing confidential information, I don't know, I have nothing to lose. What explains that? Well, Mr. Storm explained that in his statement that he felt coerced to continue a relationship with Mr. Marshall in order to maintain his job. And how much credibility that is given is really up to the investigator. It goes to how well this investigation was performed, credibility determinations based on witness statements. And the Seventh Circuit has said that those types of questions are typically insulated from court review because the court's not going to act as a super human resources personnel department and step in and make those sorts of credibility determinations for the employer. They're going to leave that up to the court. Well, that's certainly true, and we say that to tiresome lengths, but it is true. On the other hand, if the investigation itself was tainted by bias against people with his sexual orientation, then what do we do? That almost sounds like an infected kind of recommendation that's then made to the authorities in the department. Well, this is not the case that is riddled with comments about sexual orientation that you see in other cases like Ortiz, where a supervisor has made derogatory comments towards an individual's protected class, and then a decision is made. Here, all these comments related to the relationship between Storm and Marshall and Marshall and Worden were appropriate and proportional to the needs of the investigation. For example, one of the comments that they say can infer discrimination is the investigators asking Marshall about being in an intimate relationship with Storm. Well, the crux of the case is did Marshall make sexual advances towards Storm, and if they were in an intimate relationship, that helps determine the context of the situation and the credibility of the situation. Similarly, any comment, the single comment that is alleged to have taken place where the investigator asked Marshall if Worden Brown was in a relationship with Marshall, Worden Brown had a 30-year friendship, 22 of those years were a working relationship, and certainly he was a witness, that's undisputed, and those types of questions that get at the heart of relationships between the parties can determine bias and help the investigator determine credibility. We don't want to assume that every gay man is in a sexual relationship with every other gay man, that's absurd. Certainly at the heterosexual level, most of us go around having business relationships and other friendships with people of the opposite sex without anything close to a sexual relationship. That's certainly true, and those questions weren't asked during the law enforcement conference investigation. That investigation had nothing to do with sexual advances and no questions were asked about intimate relationships between the parties. That's completely free of those types of questions because they're not relevant to anything having to do with the law enforcement conference, but in the context of whether someone made sexual advances, those are appropriate proportional questions. I want to point out there's another statement that they make about where one of the investigators knows Jordan Bolden makes a statement related to he's a predator, and they point to that as inference of discrimination. Well, that statement, contrary to what they say in their brief, was found in Jordan Bolden's notes with her interview with Bob Storm, not Robbie Marshall. The evidence in the record from Bolden says that that statement was not made by her. It was a quote that Robb Storm made about Robb Marshall, and there's no evidence that that was Bolden's opinion about Marshall at all. That's a direct quote from Storm. I want to move on to this removal of Warden Brown from being the decision maker. I think that's a hot point in this case that I want to address. Yeah, do that, and then also please say a word about the anticipatory retaliation. Yes, Your Honor, briefly. Marshall claims that Brown's exclusion is an inference of terminating him because of his sexual orientation, but you have to remember that Warden Brown was the one who initiated the SPD to come investigate the case, and he did so because of the nature of the allegations, and that's clear in the record. The reason for his removal as a decision maker has been the same throughout the case, that he was a witness, and indeed he was interviewed as a witness in this case. Brown even said himself that there would be an appearance of bias if he was the one making the decision. Moving on to the anticipatory retaliation claim, there are cases that do hold there is such a thing as anticipatory retaliation, but the common fact in those cases appear to be that there's a victim who has suffered some sort of harassment. The employer knows about it. Then the employer takes action, either they have an adverse employment action or they make a threat to the victim in order for the victim to deter them from filing a charge or filing a lawsuit, and that's not the sequence of events that happened here. The sequence of events here, there was a meeting to discuss the termination amongst Department of Corrections leadership and their counsel. A decision was made during that meeting to terminate Rob Marshall based on the two incidents. Then in discussion with counsel, they discussed preparation in the event that some sort of claim would be filed, and that claim would be discrimination based on sexual orientation. That's expected conversation between counsel and client about what the potential ramifications are or the exposures could be related to an action that they took. I don't think that's evidence at all of trying to deter him from filing a claim. So your view is that there should have been some preexisting evidence of negative actions based on sexual orientation that they were then saying, you know, if you make a move, then we'll fire you, you know, some sort of... It's that there was no evidence prior to this series of events? I think that's important, and I also think it's important that nothing was... Marshall didn't even know if he was going to be terminated. He didn't let the DOC... He didn't make any statement to the DOC about engaging in any protected activity, and simply there's just no fact that would lead to an inference that the decision was made based on his sexual orientation to do anything. And just lastly, I just want to follow up by saying, in this case, there hasn't been any shifting explanations about what the reasons were for Marshall's termination. They remain consistent. There were two thorough investigations. Plaintiff's whole case is about these investigations were shoddy because of, you know, he was treated differently because of his sexual orientation, but there's really no evidence of that, and the evidence that Plaintiff points to are credibility determinations that, in cases like Cariadis that this court has said, they're not going to fit as a super, say, human resources personnel department. The termination may have been unfair to Mr. Marshall, but that doesn't make it unlawful. And that's all I have, judges. Thank you. All right. Thank you very much, then. Anything further, Ms. Blevins? Yes, Your Honor. I just want to touch on a couple of things. Regarding the law enforcement conference, I wanted to point out that Mr. Raderstorff, who did the investigation, said he did not believe from his experience that Mr. Marshall would have been terminated solely for that offense, so that's why we don't believe that's in the appellate record at 635 to 636. And Warden Brown testified that he would not have even terminated Mr. Marshall for the sexual harassment allegations because of the suspicious timing of Mr. Storm coming forward, and that's in the record at appellate 597 to 612. So it's solely for this law enforcement conference issue. We do not believe, and we think the record is clear, that Mr. Marshall would not have been terminated for that issue, but for these sexual harassment allegations, he would not have been terminated. Ms. Blevins, let me just ask you, though. Yes, Your Honor. We do have those two incidents, and those are the ones that the state is resting on, but there was a prior record, too, for Mr. Marshall, the 2015 DUI, and he pleads to public intoxication, gets reprimand there. Correct. So there's something. Right. There is something, but, again, Mr. Raidersdorf, who said in his experience Mr. Marshall would not have been terminated for this law enforcement conference issue that had come up, and he knew about the DUI as well. So Mr. Raidersdorf had been doing investigations of this kind for years, and he said in his experience he did not believe that Mr. Marshall would have been terminated, but he had never got to the point of considering it on its own because this other issue came up, these allegations by Mr. Storm. But, again, Warden Brown said that he wouldn't have been terminated for the sexual harassment allegations. And as to the investigation, I wanted to point out that we also have pointed to the fact that both Mr. Raidersdorf and Warden Brown, who routinely conduct investigations, testified that they believed the investigation by the state personnel into Mr. Storm's allegations about Mr. Marshall was not thorough, and that's in the record 597 to 598. So it wasn't just Mr. Marshall who thought that it was flawed. It was also longtime career persons who had done these investigations themselves that believed that the investigation by the state personnel department was flawed. And while Mr. Warden Brown did call in the state personnel department to do this investigation, I believe that he expected that they would do a thorough investigation, and he does not believe that they did so, and that he thought the investigation is flawed. So it's not just Mr. Marshall who thinks that. It's other persons, significant persons involved with the investigation and the incidents that believed so. And, Your Honor, I wanted to touch briefly on the anticipatory retaliation again. The individual is not required to engage in any kind of protected activity. Okay, you'll need to be quick with this because you're now over time. I just wanted to say the individual is not required to have engaged in any kind of protected activity before the adverse action is taken, and we believe that there's at least an issue of fact because Mr. Moravich was citing information that was not in the record about counsel being there and having a legal conversation.  And so we believe that this case should be reversed because it was termination on the basis of Mr. Marshall's sexual orientation, and there are at least issues of fact as to that as well as issues of fact as to whether there was anticipatory retaliation. All right. Thank you very much. Thank you so much. Thanks to both counsel. We will take the case under advisement.